**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CARLETTE BRANSCOMB-HYDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 5073 |
| | ) | |
| JO ANNE B. BARNHART, COMMISSIONER | ) | Judge Nan R. Nolan |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Carlette Branscomb-Hyde claims that she is disabled due to bladder problems, asthma, migraines, and gastrointestinal problems. She filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. § 1382. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons set forth here, the Commissioner's motion is granted and Plaintiff's motion is denied.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on March 20, 2000, claiming that she became disabled on January 1, 1990 due to limitations caused by asthma, migraines, gastrointestinal problems, and urinary incontinence. (R. 39.)[1] There is no initial denial notice in the record, but the Social Security Administration ("SSA") deemed proper Plaintiff's February 20, 2001 request for an administrative hearing. (R. 40.) The hearing was held on July 12, 2002, with Plaintiff represented by an attorney. (R. 324-44.) On September 24, 2003, the Administrative Law Judge ("ALJ") denied Plaintiff's claim for benefits, finding that she has the residual functional capacity ("RFC") to perform a significant

---

[1]    The Agency apparently lost the original application, but the parties agree it was filed on March 20, 2000. (R. 327; Pl. Mem., at 1; Def. Mem., at 1.)

range of light work. (R. 37.) The ALJ found that Plaintiff's subjective complaints of disabling migraines and urinary incontinence were not fully credible when compared with the objective medical evidence, particularly the fact that Plaintiff had no long-term history of migraine or bladder treatment. (R. 35-36.) The ALJ concluded that though Plaintiff had no past relevant work experience, she was able to perform a significant range of light duty work and, thus, was not entitled to disability benefits. (R. 37.) The Appeals Council denied Plaintiff's request for review on November 3, 2004, and denied her Request to Vacate the Appeals Council Denial on May 6, 2005. Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

Plaintiff was born on September 19, 1960 and was 42 years old at the time of the hearing before the ALJ. (R. 58, 324.) Plaintiff has more than a high school education but has not worked since February 1987. (R. 48.) She lives in an apartment with her 13-year-old daughter, and has a son in college. (R. 326-27.)

### A. Medical History

As noted, Plaintiff claims that she became disabled on January 1, 1990. She did not become eligible for SSI benefits, however, until she first applied for them in March 2000. To the extent the ALJ considered both Plaintiff's pre- and post-filing medical history, the court addresses both below.

#### 1. Pre-Application

In August and September 1992, Plaintiff was treated for mid-epigastric pain and alternating diarrhea and constipation. (R. 50-55.) An upper GI test found "[t]hickened duodenal folds, suggestive of duodenitis," but no evidence of any ulcer. (R. 53.) Plaintiff was also diagnosed with asthma at that time. (R. 54.)

Approximately one year later, in November 1993, Plaintiff was treated for headaches. (R. 288.) A cerebral angiogram was "[u]nremarkable," showing "no evidence for aneurysm, AVM,[2] tumor vascularity or displacement of vessels." (R. 289.) An electroencephalogram ("EEG") performed in December 1993 was similarly normal. (R. 285.) Plaintiff was taking Elavil[3] at that time. (*Id.*)

Nearly three years later in September 1996, Plaintiff went to the University of Chicago Hospitals emergency room ("U of Chicago ER") complaining of chest pain. A chest x-ray showed clear lungs and a normal heart size. (R. 151.) Plaintiff returned to the U of Chicago ER in December 1998 complaining of coccyx pain. A lumbar spine x-ray was normal, with "[n]o significant degenerative changes." An x-ray of Plaintiff's sacrum and coccyx was also negative, with no evidence of fracture or dislocation. (R. 152.)

Plaintiff did not receive any further medical treatment until August 4, 1999, when she went to the U of Chicago ER with left-sided arm and leg weakness. A head CT scan showed no intracranial hemorrhage, but toxicology tests were positive for acetaminophen and alcohol. (R. 153, 167.) On August 26, 1999, Plaintiff had a chest x-ray at Michael Reese Hospital and Medical Center that showed "[n]o acute cardiopulmonary process." (R. 115.) Two months later on October 29, 1999, Plaintiff was prescribed a variety of medications, including Terazol (an antifungal vaginal ointment); Prilosec (a proton pump inhibitor used for a variety of gastric disorders); Amoxicillin (antibiotic); and Biaxin (antibiotic). Plaintiff was also diagnosed with Gastroesophageal Reflux Disease ("GERD") and was prescribed Ranitidine (i.e., Zantac, a histamine blocker used to prevent ulcers and treat GERD). (R. 88, 146-50.) The following month, Plaintiff received a prescription for

---

[2]     "AVM" or "Arterio-Venous Malformation" is an abnormal collection of blood cells. (http://cpmcnet.columbia.edu/dept/cerebro/AVM.htl.)

[3]     Elavil is an antidepressant sometimes used to prevent migraine headaches. (http://www.healthsquare.com/newrx/ela1155.htm.)

Diflucan (an antifungal for vaginal yeast infections); Terazol; and Tetracycline (antibiotic). (R. 143-45.)

On January 28, 2000, Plaintiff went to Michael Reese Hospital complaining of weight loss and difficulty swallowing ("dysphagia"). A CT scan of the thorax was normal, and a CT scan of the neck showed normal patency (openness) of the airway. (R. 107-08.) Plaintiff's neck had numerous lymph nodes that were "generally not of significant overall radiographic size," but the doctor recommended a clinical evaluation of the neck. The doctor also noted some areas of abnormal soft tissues in the right maxillary area. (R. 108.)

Several days later on February 2, 2000, Plaintiff was examined by a physician at Michael Reese Hospital. At that time, Plaintiff reported a history of gastritis, ulcers, and reflux, and stated that she had been on Zantac for years. She also reported a history of sinusitis and mild asthma, and confirmed that she was taking Prilosec, Biaxin, and Pepto Bismol. (R. 103.) The doctor noted some inflammation in Plaintiff's throat, enlarged lymph nodes in her neck, and a soft tissue mass in the right maxillary area. (*Id.*) A week later, Plaintiff saw Dr. Steven Steiner, a Gastroenterologist at Michael Reese Hospital, for a follow-up on her gastritis. Dr. Steiner noted that Plaintiff smelled of alcohol, had a history of gastritis secondary to alcohol usage, and continued to drink. (R. 102.) Plaintiff reported that she had been unable to complete a prescribed course of medications due to difficulty tolerating them, and that she experienced alternating constipation and diarrhea. She also complained of persistent pain in her right upper and lower quadrants. (*Id.*) Dr. Steiner prescribed Prilosec, Amoxicillin, Tetracycline, and Pepto-Bismol. (R. 102, 136-39.)

On February 15, 2000, Dr. Steiner diagnosed Plaintiff with dysphagia and prescribed Vancenase (a corticosteroid for allergic rhinitis). On February 20, 2000, Plaintiff returned to Michael Reese complaining of vaginal/uterine bleeding. (R. 99, 100, 135.) Blood tests showed elevated liver enzymes. (R. 97-98.)

### 2. Post-Application

Plaintiff continued to seek medical care after she applied for SSI benefits in March 2000. The record reflects that she pursued this care both before and after her July 12, 2002 hearing before the ALJ.

### a. Treatment Before the July 12, 2002 Hearing

On April 11, 2000, Plaintiff reported to the U of Chicago clinic with hair loss and a rash on her left leg. (R. 56.) The doctor told her to stop using chemicals on her hair, and to take Fluocinonide, a corticosteroid ointment, for the rash. (R. 57, 129.) Plaintiff continued to take Prilosec and Acetaminophen at that time. (R. 130-31.)

On May 10, 2000, Plaintiff underwent a hysterectomy at Michael Reese Hospital. (R. 85.) The surgical report indicates that Plaintiff's bladder had been scarred from a prior, unidentified surgery. In addition, Plaintiff's bladder was inadvertently lacerated during the procedure, necessitating a repair cystotomy (surgical incision of the urinary bladder). (R. 85-87.) Plaintiff was discharged from the hospital on May 12, 2000, with prescriptions for Macrobid (for urinary tract infections) and extra-strength Tylenol (Acetaminophen). (R. 81, 127, 132.) Plaintiff also filled the following prescriptions in May 2000: Metrogel (an anti-infective vaginal gel); Terazol; and Prilosec. (R. 123, 125, 127.) Dr. Ramesh C. Seeras, a physician at Michael Reese Hospital, noted that Plaintiff would require four to six weeks to fully recover. (R. 82.)

On July 26, 2000, Plaintiff had a renal ultrasound at Michael Reese Hospital. The results were normal. (R. 74.) Shortly thereafter, on August 16, 2000, Dr. Balite Monette of Michael Reese saw Plaintiff and wrote a note certifying that she needed to be off work later that month to attend appointments with a urologist and a gastrointestinal specialist.[4] (R. 73.) At that time, Plaintiff's medications included Trimethoprim (antibiotic), Zomig (cerebral vasoconstrictor for relief of migraine headaches), and Oxybutynin (anticholinergic agent for bladder conditions). (R. 120-22.)

---

[4]    Plaintiff apparently was participating in a job training program at that time. (R. 327-28.)

Plaintiff was seen at the Department of Pathology & Laboratory Medicine as an outpatient on October 27, 2000. Blood tests taken that day showed some elevated liver enzyme levels. (R. 70, 71.) Five days later, on November 1, 2000, Dr. Monette completed a State of Illinois Department of Human Services questionnaire indicating that Plaintiff had been diagnosed with weight loss of an unknown etiology, elevated liver function levels, and stress incontinence[5] status post hysterectomy. (R. 60.) Dr. Monette recommended that Plaintiff stop using alcohol, stop smoking, and continue with her medications. (*Id.*) He also opined that Plaintiff's medical condition would prevent her from working for one month while she underwent further medical evaluation. (R. 61.)

On November 7, 2000, Plaintiff had an ultrasound of her liver and pancreas, which was normal except for some fatty changes within the liver. (R. 62.) A chest x-ray taken the same day was normal, though blood tests showed slightly low red blood cell and hematocrit[6] counts. (R. 63, 66.) Pharmacy records from December 2000 show prescriptions for the following medications: Spectazole cream (an anti-fungal vaginal cream), Detrol (used to treat overactive bladder with symptoms of urinary frequency, urgency, and incontinence), and Trimethoprim. (R. 117-19.)

Plaintiff went to the U of Chicago ER on February 22, 2001 complaining of abdominal pain in her left lower quadrant. (R. 158.) A pap smear showed benign cellular changes associated with inflammation, and blood tests showed abnormal liver function levels. (R. 154, 160, 271.) On March 6, 2001, Plaintiff went to the U of Chicago clinic and was diagnosed with mixed incontinence. (R. 158.) On March 20, 2001, Plaintiff returned to the U of Chicago clinic complaining of weight loss, and gynecological problems. (*Id.*) A pelvic ultrasound showed irregularity in the right ovary, and

---

[5]    "Stress incontinence" is "an involuntary loss of urine that occurs during physical activity, such as coughing, sneezing, laughing, or exercise." (http://www.nlm.nih.gov/medlineplus/ency/article/000891.1htm.)

[6]    The hematocrit test is used to evaluate anemia. (http://www.labtestsonline.org/understanding/analytes/hematocrit/test.html.)

a CT scan of the upper abdomen showed some liver enlargement but no pancreatic abnormality. (R. 155, 156, 267, 268.)

Plaintiff returned to the U of Chicago clinic on June 22, 2001, this time complaining that she had been experiencing fitful coughing, shortness of breath, and chest heaviness and tightness over the previous three days. She weighed 123 pounds at the time. She denied having any abdominal pain or reflux symptoms, but her lung sounds were tight with scattered wheezing. The clinic nurse gave Plaintiff an Albuterol nebulizer, which helped her breathing. The nurse also gave Plaintiff a prescription for Albuterol, and recommended that she stop smoking and return for a follow-up visit the following week. (R. 157.)

Plaintiff next saw a doctor at U of Chicago on September 27, 2001. A chest x-ray showed clear lungs, no significant cardiovascular disease, and no evidence of neoplastic process.[7] (R. 260.) A pulmonary function study showed no abnormalities, except for "a slight reduction in diffusing capacity," which "may be normal after correction for hemoglobin." (R. 263.) Plaintiff showed minor improvement in pulmonary function with an inhaled bronchodilator. (*Id.*) She also had a pelvic ultrasound that showed a mass on the right ovary. (R. 262.) This mass appeared again one month later on a subsequent October 31, 2001 pelvic ultrasound. (R. 259.)

On February 12, 2002, Plaintiff had some blood tests at the U of Chicago showing elevated liver enzymes and somewhat higher than normal cholesterol levels. (R. 257-58.) Six months later, on August 19, 2002, James A. Runke, M.D. performed a consultative examination of Plaintiff at the request of the SSA. Plaintiff complained of asthma, migraines, ulcers, and bladder problems, and stated that she could not walk more than one block or climb more than one or two flights of stairs before stopping due to shortness of breath. (R. 231.) Plaintiff stated that she occasionally had a

---

[7]     "Neoplastic process" is the "pathological mechanisms and forms taken by tissue during degeneration into a neoplasm and its subsequent activity." (http://www.wrongdiagnosis.com/medical/neoplastic_process.htm.)

"productive cough, especially around 5 or 6 in the morning." She also reported having epigastric pain on and off over the previous five years, which was under "good control" with protonic medications. (*Id.*) Plaintiff told Dr. Runke that she experienced stress incontinence when coughing, sneezing, or laughing too hard, and reported that it was "a real problem if I get a bad asthma attack." (*Id.* 232.) Plaintiff took Detrol, wore panty liners, and used a plastic mattress cover to deal with the problem.

Plaintiff also stated that she had been experiencing migraine headaches a couple of times per week since late 2001. Plaintiff reported taking Maxalt (a medication used for the abortive treatment of migraines) at that time, though the record does not contain a prescription for that medication. In any event, Plaintiff stated that the Maxalt caused her to sleep for about 4 hours and wake up a little disoriented, but it eventually brought the headache under control. (*Id.*) Plaintiff's other medications at that time included Advair and Albuterol (for asthma), Allegra (for sinus congestion), Wellbutrin (an antidepressant sometimes used as a smoking deterrent),[8] and ibuprofen (a non-steroidal anti-inflammatory for mild to moderate pain). (*Id.*)

Upon examination, Dr. Runke found Plaintiff to be well nourished at 113.7 pounds. She moved about the examination room without any apparent hesitation, difficulty, or discomfort. (*Id.*) Examination findings were normal, including clear lungs; normal heart sounds; normal pulmonary spirometry results[9]; full strength; no sensory or reflex deficits; intact cranial nerves and negative cerebellar testing; painless motion in all joints; normal gait; and normal ability to use both hands. (R. 232-33.) Dr. Runke also found Plaintiff to be appropriate, polite, pleasant, and cooperative, with good hygiene and grooming. (R. 233.)

_____

[8]    (*See* http://www.drugs.com/wellbutrin.html.)

[9]    Spirometry measures how well the lungs exhale. (http://www.nlm.nih.gov/medlineplus/ency/article/003853.htm.)

Dr. Runke concluded that Plaintiff had a history of asthma and seasonal sinus condition, controlled with medication. She also had a history of frequent migraine headaches; a history of peptic ulcer disease, controlled with medication; and post surgical stress incontinence following a hysterectomy. (R. 233-34.) Dr. Runke completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), opining that Plaintiff could lift 20 pounds occasionally due to stress incontinence, and could lift less than 10 pounds frequently. She could also sit for about six hours in an eight-hour workday, and occasionally climb, balance, kneel, crouch, crawl, and stoop. (R. 235-36.) Plaintiff had no limitations on standing, pushing/pulling, engaging in manipulative functions, seeing or communicating. (R. 235, 237.) According to Dr. Runke, Plaintiff's impairments did, however, limit her ability to be exposed to temperature extremes, dust, fumes, odors, chemicals, and gases. (R. 238.)

### b.      Treatment After the July 12, 2002 Hearing

At the July 12, 2002 hearing, the medical expert, Dr. Bernard Stevens ("ME"), testified that he could not "formulate exactly what [Plaintiff's] impairment is." (R. 342.) The ME explained that there were no pulmonary function tests, no evidence of any follow-up on Plaintiff's bladder injury, and "no follow-up at all about these severe headaches." (*Id.*) The ME noted that Plaintiff had migraine medication, but stated that "the record itself does not speak about any kind of chronic treatment for migraines." (R. 331.) He suggested that Plaintiff undergo a general internal medicine consultative examination, including a CBC (Complete Blood Count), chemistry panel, and pulmonary function tests. (R. 342-43.)

Shortly after the hearing, on August 27, 2002, Plaintiff had a hepatic function panel at U of Chicago. The panel again showed elevated liver enzymes. (R. 256.) On September 19, 2002, Plaintiff went to St. Bernard Hospital complaining of sudden back pain that made it difficult for her to stand. (R. 297.) On examination, Plaintiff had bilateral muscle spasms and tenderness, but her sensation, reflexes, and motor findings were all normal. (R. 299.) In addition, a lumbosacral spine

x-ray was negative. (R. 301.) Plaintiff was diagnosed with back pain and arthritis, and was discharged with a prescription for Tylenol #3. (R. 306.)

On February 17, 2003, Dr. Runke performed a second consultative examination of Plaintiff per the ME's suggestion. Plaintiff told Dr. Runke that she had lost 40 pounds in 30 days the previous August, and that she now experienced "problems with leaking of my urine if I sneeze, cough or laugh, and the breathing." (R. 307.) Plaintiff reported taking Detrol to control her stress incontinence, Advair, Albuterol, Maxalt for headaches, Aciphex for gastritis, and Pepto-Bismol and Mylanta as needed. (*Id.*) Plaintiff stated that her gastritis was under "good control" with the medications, and that she had no bleeding episodes or persistent symptoms, and no other complications. (R. 308.) Plaintiff told Dr. Runke about an October 2002 emergency room treatment for breathing difficulties, but there are no records supporting such a visit. In any event, Plaintiff confirmed that she had reduced her smoking to 1/2 a pack per day, but stated that she continued to experience coughing and shortness of breath, and could not walk more than a block before feeling short of breath. (*Id.*) Plaintiff also stated that she was hospitalized for arthritis and back pain shortly after October 2002, but that she had not experienced any subsequent arthritis flare-ups and just took ibuprofen "every time I get a twinge of pain in my back." (*Id.*)

Dr. Runke noted that Plaintiff weighed 127 pounds, appeared well-nourished, and was able to move about the examination room without apparent hesitation, difficulty or discomfort. (*Id.*) Her respiratory rate was unlabored, but Dr. Runke did notice an occasional "wheezy productive cough." (*Id.*) When he listened to Plaintiff's lungs, he observed diffuse expiratory wheezes and scattered rhonchi, but all other examination findings were normal. (R. 309, 315-16.) Dr. Runke concluded that Plaintiff had asthma; a history of degenerative joint disease; a history of ovarian cyst operation in 2000, with residual stress incontinence since that time; and past history of anemia, without recurrence. (R. 310.) Dr. Runke also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). He opined that Plaintiff could lift 20 pounds occasionally, 10 pounds

frequently, stand and/or walk for six hours in an eight-hour workday, sit without limitation, and occasionally perform all postural activities. (R. 311-12.) Plaintiff had no manipulative, visual, or communicative limitations, but she did have restrictions on exposure to temperature extremes, airborne irritants, dust, fumes, odors, chemicals, and gases. (R. 314.)

## B. Plaintiff's Testimony

Plaintiff testified that she initially thought her medical problems had been solved after her hysterectomy in May 2000. She signed up for a job training program in an attempt to re-enter the job market, but her medical problems continued and she was unable to complete the program. (R. 327-28.) Plaintiff noted that doctors had accidentally lacerated her bladder during the surgery, which caused her to experience stress incontinence. (R. 328, 330.) She also stated that she weighed 123 pounds and continued to lose weight. (R. 329.) Plaintiff admitted to past problems with alcohol but testified that she had decreased her consumption as of February 2002. (R. 332.)

Plaintiff testified that she experienced migraine headaches about once per week, during which her head felt like it would "explode" and she had sensitivity to light and head movement. (R. 333.) Plaintiff initially took Ibuprofen for the headaches, but that became ineffective and, moreover, her "ulcer doctor" told her to stop taking that medication. (R. 334.) She switched to Maxalt, which generally put her to sleep for four to five hours. (R. 333.) When Plaintiff's ulcers flared up, which was often, she was unable to eat solid foods and tried to stay on a clear diet. (R. 335.) The Maxalt aggravated her ulcer, as did the Albuterol she took for asthma. Plaintiff said that she experienced asthma attacks two or three times per week, usually early in the morning. Advair did not provide much relief, so she tried to breathe steam and/or use Albuterol. (R. 335-36.) Plaintiff also testified that she had trouble sleeping at night and never felt well-rested due to her asthma and bladder problems. (R. 338, 340.) She had a plastic liner on her bed for accidents and leakage, and she wore panty liners or pull-ups to deal with leakage she experienced during the day upon coughing or sneezing. (R. 338.)

In describing a typical day, Plaintiff stated that she generally arose at 4:00 a.m. or 5:00 a.m., either due to an asthma attack or to use the bathroom. On days when her daughter had school, Plaintiff would stay up until the daughter left and then go back to bed until about 1:00 p.m. (R. 338-39.) If she had energy during the day (usually about twice a week), she would cook something that would last for a few days. Three times per week she would lie down, watch television, and go to sleep because of her medication. (R. 339-40.)

## C.     Medical Expert Testimony

As noted, the ME stated that he could not exactly identify Plaintiff's impairment. He noted that nothing in the medical records indicated that Plaintiff had any follow-up treatment for her bladder injury, nor was there any evidence of follow-up for her headaches. According to the ME, there were no tests available to medically verify Plaintiff's complaints of migraines. (R. 342-43.)

## D.     The ALJ's Findings

The ALJ found that Plaintiff, a younger individual with more than a high school education, was capable of performing at least a significant range of light work based on a detailed analysis of her medical history. (R. 33-37.) In reaching this conclusion, the ALJ found that Plaintiff's subjective allegations of a stomach ailment, urinary frequency, weight loss, and migraines were "less than fully credible" in that they could not be verified by the objective medical record. The ALJ noted that "[i]f complaints of migraines are to be taken seriously there would have to be some evidence of a long history of treatment with various medications in an effort to control headaches. No such evidence has been provided." (R. 36.) As for Plaintiff's asthma, the ALJ noted that her pulmonary function test was normal, and that Dr. Runke had twice concluded that she could perform a significant range of light work. (*Id.*) Based on Plaintiff's age (42), educational background, and residual functional capacity, the ALJ concluded that Plaintiff could make a successful adjustment to work that exists in significant numbers in the economy pursuant to Medical Vocational Rule 202.20. (R. 36-37.)

## DISCUSSION

## A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). (citation omitted).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## B.    Five-Step Inquiry

To recover SSI under the Social Security Act, a claimant must establish that she is a "disabled" indigent person within the meaning of the Act. *Greenwood v. Barnhart*, 433 F. Supp. 2d 915, 924 (N.D. Ill. 2006). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a

13

disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520, 416.920; *Boiles v. Barnhart*, 395 F.3d 421, 424 (7th Cir. 2005); *Greenwood*, 433 F. Supp. 2d at 924-25.

## C.    Analysis

Plaintiff argues that the ALJ erred in concluding that she is capable of performing at least a significant range of light work.  She claims that the ALJ improperly disregarded her limitations due to urinary frequency/incontinence and migraine headaches, including failing to adequately assess her credibility under SSR 96-7p.  Plaintiff also contends that the ALJ erred in relying on the Medical-Vocational Guidelines ("grids") to determine that she could perform a significant range of light work in the national economy.  The court disagrees.

### 1.    Plaintiff's Bladder Problems and Migraines

Plaintiff argues that the ALJ failed to give appropriate weight to her complaints of urinary frequency/incontinence and migraine headaches.  SSR 96-7p requires an ALJ to determine whether a claimant's "statements concerning h[er] symptoms and their functional effects are credible."  *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007).  If the statements are not substantiated by objective medical evidence, the ALJ must consider all of the evidence in the record and evaluate the claimant's testimony in light of her daily routine; the duration, location, and frequency of the symptoms; aggravating factors; medication; other treatments; and other relevant factors.  SSR 96-7p; *Arnold*, 473 F.3d at 822; *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although a claimant can establish the severity of h[er] symptoms by h[er] own testimony, h[er] subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."  *Arnold*, 473 F.3d at 823 (citing *Carradine v. Barnhart*, 360 F.3d 751, 764

(7th Cir. 2004)).   An ALJ's credibility determination will not be overturned unless it is clearly incorrect.  *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

The ALJ found that Plaintiff's urinary problems and migraines were severe, but not severe enough to meet or equal an impairment listed in the Regulations.  In reaching this conclusion, the ALJ found Plaintiff's subjective allegations "less than fully credible – based on the evidence of record."  (R. 36.)  The ALJ noted that for both conditions, "there are no records in the file showing follow-up treatment."   (R. 35.)   The ALJ explained further: "Other than asthma, claimant's complaints are subjective and cannot be verified.   If complaints of migraines are to be taken seriously there would have to be some evidence of a long history of treatment with various medications in an effort to control headaches."  (R. 36.)

### a.   Incontinence

Plaintiff argues that the ALJ failed to consider that her bladder was accidentally lacerated during surgery, and that she was prescribed Detrol and Oxybutynin to control her stress incontinence.  (Pl. Mem., at 12.)  She first contends that the ALJ should have considered the fact that stress incontinence "can occur with merely standing." (Pl. Reply, at 5.)  Plaintiff never claimed that she had such a problem, however, stating only that she experienced stress incontinence upon sneezing, coughing, and laughing.

Plaintiff also argues that "asthma would be sufficient to provoke . . . incontinence," noting that she had a wheezing, productive cough.  (*Id.* at 6.)  The ALJ correctly observed, however, that despite these two conditions, Dr. Runke twice concluded that Plaintiff could perform a broad range of light work.  Plaintiff was diagnosed with stress incontinence in November 2000.  At that time, the doctor opined that she would be unable to work for one month.  (R. 60-61.)  On March 6, 2001, Plaintiff was diagnosed with mixed incontinence.  (R. 158.)  She was taking Detrol at that time, but there is no evidence that she sought any further treatment after that date.  (R. 158.)  Significantly, Plaintiff has not identified any treating or other physicians who suggested that she was unable to

work due to asthma-induced incontinence.  It therefore was not error for the ALJ to rely on Dr. Runke's opinion that Plaintiff's incontinence and asthma were not disabling, either alone or in combination.  *See Ellis v. Barnhart*, 384 F. Supp. 2d 1195, 1201-02 (N.D. Ill. 2005) ("[T]he Seventh Circuit has stated that these opinions [from consulting physicians] may be more impartial because they are free from the biases that could affect the opinions of treating physicians who have a personal relationship with their clients."); *White v. Barnhart*, 415 F.3d 654 (7th Cir. 2005) (a physician without an on-going relationship with the claimant is not a treating physician).

Plaintiff objects that the ALJ did not adequately explain why he rejected her subjective complaints of disabling incontinence.  She notes her testimony that she has to line her bed with plastic in case of accidents during the night, that she "frequently" goes to the bathroom, and that she often wakes up around 4:00 a.m. or 5:00 a.m. because she needs to use the bathroom.  (Pl. Reply, at 6; R. 338.)  Plaintiff made similar complaints to Dr. Runke, however, and he still found her capable of performing light work.  (R. 232.)  In addition, as the ME noted, Plaintiff never sought additional treatment for incontinence after March 2001, but merely complained of the symptoms to Dr. Runke.  Significantly, Plaintiff's prescriptions for Oxybutynin and Detrol both expired in August and December 2001, respectively, and there is no evidence that she obtained new prescriptions from 2002 forward.  (R. 118, 121.)  *See Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability.")

Plaintiff did report to the emergency room complaining of incontinence in March 2001, but an ultrasound and CT scan of the abdomen did not reveal any bladder problems and, as noted, Plaintiff did not pursue any further treatment.  (R. 155, 156, 158.)  Absent objective medical evidence supporting Plaintiff's assertion that her stress incontinence was disabling, the ALJ reasonably relied on Dr. Runke's contrary opinion.  The ALJ fairly acknowledged and considered Plaintiff's condition, and he was not patently wrong in determining that Plaintiff could perform a

broad range of light work despite her subjective complaints. Plaintiff's motion for summary judgment on these grounds is denied. *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.") (internal quotations omitted).

### b. Migraines

Plaintiff concedes that she has no recent written diagnosis of migraines, but argues that the ALJ failed to consider her prescriptions for Elavil, Zomig and Maxalt. (Pl. Mem., at 12, 13.) Plaintiff was apparently taking Elavil in 1993, and she received a prescription for Zomig in August 2000. (R. 122.) There is no evidence of any prescription for Maxalt, but Plaintiff told Dr. Runke in August 2002 that she was taking that medication and had been experiencing migraines a couple of times per week since late 2001. (R. 231-32.) When Plaintiff saw Dr. Runke again in February 2003, however, she did not even mention headaches, but merely stated that she was still taking Maxalt. (R. 307-08.) The only time that Plaintiff did seek medical treatment specifically for her headaches was in November and December 1993. (R. 288.) A cerebral angiogram and EEG were both normal at that time. (R. 285, 289.) The remaining evidence of migraines comes exclusively from Plaintiff's own assertions, without any medical confirmation.

Plaintiff suggests that she did not seek further treatment because after the angiogram, EEG, and medications, she thought "there was nothing else she could do." (Pl. Reply, at 3.) She argues that the ALJ should have asked her about this but, instead, "played doctor in finding that migraines in general cannot be 'taken seriously' without both a long history of treatment and the prescription of various medications." (*Id.* (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").) The court disagrees that the ALJ "played doctor" in this case. Dr. Runke examined Plaintiff and twice concluded that her migraines did not preclude her from performing a broad range of light duty work.

Plaintiff is correct that the ALJ cannot disregard her complaints of pain merely because they are not supported by objective medical evidence. *Clifford*, 227 F.3d at 871. Plaintiff stresses her testimony that when she takes Maxalt, she has to sleep for four or five hours and has limited functionality for three days. She also notes that her complaints of dizziness, drowsiness, and fatigue are consistent with the known side-effects of Maxalt. (Pl. Mem., at 14-15.) The ALJ did not directly mention this evidence, but he referred to Dr. Runke's August 2002 report, which reiterates these subjective complaints. (R. 232.) *See Lawson v. Barnhart*, 455 F. Supp. 2d 747, 761 (N.D. Ill. 2006) (the ALJ "need not discuss every piece of evidence in the record" as long as he builds "an accurate and logical bridge from the evidence to h[is] conclusion.") To the extent Plaintiff did not seek treatment for her migraines, and did not even mention them to Dr. Runke in February 2003, the ALJ was not patently wrong in finding her complaints of disabling pain lacking in credibility. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (affirming denial of benefits where the ALJ "noted [claimant]'s testimony concerning the headaches, but also observed that she had never sought any treatment for them, and that none of the doctors who examined her imposed any specific limitations on her activities because of the headaches.")

### 2.    The Medical-Vocational Guidelines

Plaintiff also objects that the ALJ improperly relied on the Medical-Vocational Guidelines in finding her not disabled, rather than consulting with a vocational expert ("VE"). At step five of the sequential analysis, the ALJ  must determine whether a claimant who cannot perform any past relevant work can perform other work that exists in the national or regional economy. *Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005). The ALJ may use the grids to make such a determination, but must recognize that the grids generally take account only of exertional limitations; i.e., impairments affecting a claimant's "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing and pulling)." *Id.* (quoting 20 C.F.R. § 404.1569a(b)). Where a claimant has a non-exertional limitation (i.e., depression, anxiety, or

difficulty concentrating or remembering) that might substantially reduce the range of work she can perform, the ALJ must consult a VE rather than relying on the grids. *Id.* (citing *Zurawski*, 245 F.3d at 889).

The ALJ found Plaintiff capable of performing at least a broad range of light work pursuant to § 202.20 of the grids. (R. 36.) *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 2. Section 202.20 provides that a finding of not disabled is warranted where a claimant can perform light work and is a younger individual (age 18-44); with more than a high school education; but no skills. Plaintiff claims that she does not fall within the grids because she has non-exertional impairments, including asthma, urinary problems, and migraines. (Pl. Mem., at 9.) "The fact that a claimant suffers from a non-exertional impairment[, however,] does not . . . immediately preclude utilization of the grid." *Walker v. Bowen*, 834 F.2d 635, 641 (7th Cir. 1987) (internal quotations omitted). *See also Gardner v. Barnhart*, No. 02 C 4578, 2004 WL 1470244, at *8 (N.D. Ill. June 29, 2004) ("[T]he use of a VE is discretionary unless the claimant's nonexertional impairments are sufficiently severe.") As the Seventh Circuit has explained, "[t]o uphold the ALJ's finding that the grids may be used in a given case, we require only that there be reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." *Id.* (internal quotations omitted).

The ALJ acknowledged that Plaintiff's asthma imposes environmental restrictions on her ability to work, but noted that under SSR 85-15, "[w]here a [person has a] medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world or work would be minimal because most job environments do not involve great noise, amounts of dust, etc." (R. 36 (quoting SSR 85-15, at *8).) The ALJ also noted that Plaintiff's September 2001 pulmonary function test was essentially normal, and the record reflects that a November 2000 chest x-ray was normal as well. Plaintiff was treated at the U of Chicago clinic in June 2001 for an asthma attack, but her breathing improved with an Albuterol nebulizer treatment, and a chest x-ray taken three months

later showed clear lungs.  Following the September 2001 pulmonary function, Plaintiff did not seek further treatment for her asthma.  Dr. Runke examined Plaintiff on two occasions and concluded both times that she was capable of light work despite her asthma, and despite some diffuse expiratory wheezes and scattered rhonchi.  The ALJ did not err in concluding that Plaintiff's asthma would not significantly impact her ability to perform a full range of light work and, thus, his failure to consult with a VE on this issue was supported by substantial evidence.  *Fast*, 397 F.3d at 470 (requiring that the ALJ consult with a VE "[w]here a nonexertional limitation might substantially reduce the range of work an individual can perform.")  *Compare Presta v. Barnhart*, No. 05 C 179, slip. op., Sept. 21, 2006, Doc. 31, at 19 (ALJ erred in failing to consult a VE where the claimant had "total restrictions on climbing, balancing, kneeling, crouching, crawling, and stooping.")

The ALJ was similarly reasonable in declining to consult with a VE regarding Plaintiff's stress incontinence and migraines.  As discussed above, the ALJ fairly discounted Plaintiff's complaints of disabling bladder problems and migraines, and reasonably relied on Dr. Runke's two reports in concluding that these impairments do not render Plaintiff incapable of performing light work.  Plaintiff disagrees, arguing that her "urinary frequency/incontinence . . . creates the need for frequent and unpredictable breaks."  (Pl. Mem., at 10-11.)  Plaintiff also speculates that she "may not be able to work in occupations in which [she has] close contact with customers or coworkers." (*Id.* at 10.)  There is no evidence, however, suggesting that Plaintiff complained about, or in fact needed frequent bathroom breaks, or that she experienced difficulties being around other people due to her urinary leakage.  Indeed, Plaintiff did not seek any additional treatment for her stress incontinence after March 2001.  *See Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997) ("Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand.") (internal quotations omitted).

As for the migraines, Plaintiff argues that she experiences them once per week, and that her Maxalt "'wipes her out' causing her to need to nap[] in four-to-five hour segments."  (Pl. Mem.,

at 10.) Plaintiff speculates that "[s]uch disruption in the work schedule could preclude competitive employment." (*Id.*) Again, however, the ALJ reasonably determined that Plaintiff's migraine complaints were not fully credible given that she had no prescription for Maxalt; she did not seek any migraine treatment after 1993, aside from obtaining a prescription for Zomig in August 2000; and she did not even mention migraines to Dr. Runke during his February 2003 examination.

Plaintiff does not dispute that her remaining impairments do not alone, or in combination, render her disabled, or preclude her from performing light work. Her gastritis was under "good control" with medications as of both August 2002 and February 2003, and Plaintiff had no bleeding episodes, persistent symptoms, or complications. (R. 308.) Plaintiff told Dr. Runke that she was hospitalized in October 2002 due to arthritis and back pain, but she also acknowledged that she had not had any recent flare-ups and just took ibuprofen when she felt a twinge in her back. (*Id.*) Dr. Runke examined Plaintiff twice and concluded both times that she could lift 20 pounds occasionally; lift 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit without limitation; and perform all postural activities occasionally. She also had no visual or communicative limitations. (R. 235-38; 311-14.) The ALJ's residual functional capacity finding is supported by substantial evidence and will not be overturned here. *Young*, 362 F.3d at 1001.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for summary judgment [Doc. 31] is granted, and Plaintiff's motion for summary judgment [Doc. 27] is denied. The Clerk is directed to enter judgment in favor of the defendant.

ENTER:

Dated: April 6, 2007

_____
NAN R. NOLAN
United States Magistrate Judge